**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JACQUELINE C. PERKINS ) <br> 1918 Columbia Pike #1 ) <br> Arlington, VA 22204 ) <br> ) <br>     Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> WCS CONSTRUCTION LLC ) <br> Registered Agent: ) <br> Terry Beauford ) <br> 10509 Martinellini Drive ) <br> Laurel MD 20723 ) <br> ) <br> WCS CONSTRUCTION DEVELOPMENT ) <br>     LLC ) <br> Registered Agent: ) <br> Bradley J. Fennell ) <br> 1100 New Jersey Avenue, SE, Suite 1000 ) <br> Washington, DC 20003 ) <br> ) <br> WILLIAM C. SMITH & CO., INC. ) <br> Registered Agent: ) <br> Terry Beauford ) <br> 10509 Martinellini Drive ) <br> Laurel MD 20723 ) <br> ) <br>     and ) <br> ) <br> W. CHRISTOPHER SMITH ) <br> 1312 Beachview Road ) <br> Annapolis, MD 21403 ) <br> ) <br>     Defendants. ) | Case No.: _____ <br><br> **<u>JURY TRIAL DEMANDED</u>** |

**<u>COMPLAINT FOR WRONGFUL TERMINATION</u>**

COMES NOW Plaintiff Jacqueline C. Perkins, by counsel, and moves for judgment against the Defendants WCS Construction Inc., WCS Construction Development LLC, William C. Smith

1

& Co., and W. Christopher Smith for damages including compensatory damages, back-pay and punitive damages on the following grounds:

1. Plaintiff Jacqueline C. Perkins ("Ms. Perkins") is an adult resident of the Commonwealth of Virginia.

2. Defendant WCS Construction LLC ("WCS Construction") is a Maryland limited liability company with its principal place of business in the District of Columbia located at 3303 Stanton Road, SE, Washington, DC 20020.

3. WCS Construction is not authorized to conduct business in the District of Columbia and has not registered to conduct business as required by D.C. Code § 29–105.02(f).

4. Defendant WCS Development Corporation Inc. ("WCS Development") is a Washington D.C. corporation operating out of 1100 New Jersey Ave SE #1000, Washington, DC 20003. Defendant WCS Development controls the terms and conditions of Ms. Perkins' employment and is wholly owned and/or operated as an enterprise by defendant W. Christopher Smith.

5. Defendant William C. Smith & Co. is a corporation organized under the laws of the State of Maryland and governs the terms and conditions of Ms. Perkins employment, including, specifically, the handling, reporting and processing of workplace violence complaints.

6. Defendant William C. Smith & Co. is not authorized to conduct business in the District of Columbia and has not registered to conduct business as required by D.C. Code § 29–105.02(f).

7. Defendant W. Christopher Smith is a resident of Maryland.

8. At all times relevant herein, the decision to terminate Ms. Perkins was made by W. Christopher Smith, the owner of WCS Development, WCS Construction and William C. Smith & Co., Inc.

9. Individual liability attaches to Mr. Smith because of his role in terminating Ms. Perkins because he procured the discharge of the Plaintiff for an improper or illegal purpose and with malice, and in direct contravention of her rights to report a crime. *Myers v. Alutiiq Int'l Solutions, LLC*, 811 F. Supp. 2d 261, 269 (D.D.C. 2011)

10. Defendants, through their authorized agents within the scope of their authority, have caused the acts and/or omissions complained of herein.

11. This Court has subject matter jurisdiction because the Defendants are citizens of the District of Columbia and Maryland, the Plaintiff is a citizen of Virginia, and because the total amount in controversy exceeds $75,000.00. *See* 28 U.S.C. § 1332.

12. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in this district.

13. At times relevant, Defendants employed Ms. Perkins as an Executive Assistant to the president of WCS Construction at its offices in 3303 Stanton Road, SE, Washington, D.C. 20020. Ms. Perkins was first hired as an assistant project manager on February 19, 2016. This was her first job since she finished taking classes at Northern Virginia Community College. She was promoted to be the assistant of the president of WCS Construction, Jim Anglemyer, after she exceeded everyone's expectations. This promotion meant a large raise (to her standards) in her annual salary, increased duties, and, working, for the first time in her life, in a professional office setting.

14. By all accounts Plaintiff met and exceeded the expectations of her employer.

15. On April 20, 1999, Ms. Perkins was a student at Thomas Jefferson Middle School on Glebe Road in Arlington, Virginia. That day, two high school students, Eric Harris and Dylan Klebold, murdered twelve students and one teacher and injured twenty-one additional people before taking their own lives in Columbine, Colorado. In the shadow of this massacre, Ms. Perkins entered high school where school staff and counselors proactively reached out to incoming students to discuss this type of violence. Barely two years later, when Ms. Perkins was a freshman in high school, she learned of the September 11th terrorist attacks in New York and at the Pentagon. She watched the news coverage of this event inside her school's gym knowing her home was on Rolfe Street, a mere mile from the Pentagon. Since that time, Ms. Perkins has witnessed newscasts of workplace shootings and local violence. On September 16, 2013, a lone gunman, Aaron Alexis, fatally shot twelve people and injured three others in a mass shooting at the headquarters of the Naval Yard in S.E. Washington D.C. This type of violence has not abated; it has only increased, and is no longer "random."

16. On June 14, 2017, in Alexandria, Virginia, Republican member of Congress and House Majority Whip Steve Scalise of Louisiana was shot while practicing for a softball game a couple of miles from Ms. Perkins' home. Traffic was snarled, and she learned of the reports on the radio.

17. The next day, on the afternoon June 15, 2017, Ms. Perkins and Mr. Anglemyer were working in Mr. Anglemyer's office. Thereupon Christopher Shaw, the Vice President of WCS Construction, and Michael Christopher, Chief Financial Officer, came in to talk about the finances of a project with the Federal Realty Investment Trust in Rockville, Maryland. Due to a scheduling conflict, Mr. Anglemyer left his office and Messers Shaw and Christopher continued talking. At this point, Mr. Shaw began making specific, violent threats against John Davies of the Federal

Realty Investment Trust. Mr. Shaw said he was going to drive to down to Mr. Davies' office, take out his gun, and shoot himself in the head. Mr. Perkins was seated in her chair and was frozen with fear. She asked Mr. Shaw if he was serious about killing himself. Mr. Shaw said, "only after I shoot John [Davies] first." Then Mr. Shaw repeated that he was going to kill himself in front of the building after he shot John first. Mr. Shaw and Mr. Christopher then left the office. Visibly shaken and obviously unsettled, Ms. Perkins said a prayer and left home for the day. The following day no executives reported to the office. Executives did not typically come to the office on Fridays.

18. After considering what she had witnessed, Ms. Perkins over the weekend prepared a letter for Mr. Christopher memorializing what had happened on that Thursday afternoon. She had agonized about what to do. She looked at the employee handbook and it told her to make a confidential report. According to the workplace handbook at p. 28 provided by Defendant William C. Smith & Co. to Ms. Perkins:

> [Defendant] WCS will promptly and throughout investigate all reports of violence (actual or threatened) and of suspicious individuals or activities. **The identity of the individual making the report will be protected….** In order to maintain workplace safety and the integrity of its investigation, the company will take appropriate action as necessary. Anyone determined to be responsible for threats of (or actual) violence or other conduct that is in violation of these guidelines will be subject to corrective action, including termination.
>
> [Defendant] WCS encourages employees to bring their disputes or differences with other employees to the attention of their supervisor and the Human Resources Department before the situation escalates into violence. **The company … will not discipline or otherwise retaliate against employees for raising good faith concerns**.

Ms. Perkins, comforted by the assurances in handbook and with the encouragement of her family, decided to deliver this letter first thing in the morning on the following Monday, June 19, 2017, upon Mr. Christopher's arrival to the office. She could not bear a tragedy on her conscience. A copy of this letter is attached as Exhibit A. Mr. Christopher told Ms. Perkins to forget about it and to throw the letter in the trash. When Ms. Perkins challenged Mr. Christopher's direction, Mr.

Christopher told Ms. Perkins to go to Mr. Anglemyer because he did not want to deal with it. So, Ms. Perkins left and went to Mr. Anglemyer and told him she was scared and was going to call the police. Ms. Perkins then handed the letter to Mr. Anglemyer. There were no human resources persons for Defendant WCS Construction. The human resources function was handled by Defendant William C. Smith & Co., Inc.

20. After presenting the letter to Mr. Anglemyer, at Mr. Anglemyer's direction, Ms. Perkins delivered the letter to Betty Blaylock, the office manager of WCS Construction.

21. Upon receipt of the letter Ms. Blaylock was shocked too. Ms. Blaylock told Ms. Perkins that she will forward the letter to "corporate" which was means defendant W. Christopher Smith's office at 1100 New Jersey Ave SE #1000, Washington, D.C. 20003.

22. Later that afternoon, Shannon Benson, Director of Human Resources for WC Smith Development Inc. and William C. Smith & Co., Inc. emailed Ms. Perkins to confirm the receipt of the letter regarding Mr. Shaw. Ms. Benson asked if Ms. Perkins had spoken with Mr. Anglemyer about the incident. Ms. Perkins confirmed she did. Ms. Shannon said she would "circle back" regarding this incident. She also recommended counseling for Ms. Perkins but did not make any mention of counseling for Mr. Shaw.

23. In response, Ms. Perkins reported that she was in fear of her safety because she continues to have to work alongside Mr. Shaw and that she can feel the tension. She also wanted to know why her confidential letter was discussed with him.

23. On June 21, 2017, Ms. Benson wrote to Ms. Perkins and told Ms. Perkins that the investigation had been concluded and that she had spoken with Mr. Shaw. In response, Ms. Perkins asked what she meant and why her complaint was not kept confidential.

24. On June 26, 2017, Ms. Perkins was invited to lunch by Terry Beuford, a Senior Vice President for William C. Smith & Co. Inc. They talked about Mr. Shaw and Ms. Perkins' fears.

25. On June 29, 2017, Ramsey D. Meiser of Federal Realty Investment Trust, the company whose employee Mr. Shaw threatened to kill, sent a letter to Mr. Anglemyer, requesting that Mr. Shaw not work on any project involving Federal Realty Investment Trust. (Ms. Perkins received a copy of this letter via email at the time it came in. She was Mr. Anglemyer's assistant and saw all of his emails.) Moments later, Mr. Anglemyer received a phone call from Mr. Smith. Mr. Smith was yelling on the phone at Mr. Anglemyer because apparently Mr. Smith knew about the letter although it was neither addressed nor sent to him. During this call, Ms. Perkins heard Mr. Anglemyer tell Mr. Smith that Mr. Smith was "sweeping this under the rug"; "Why would Jackie call the cops if this was just hearsay?" and "She's involving the police."

26. On June 29, 2017 after Mr. Anglemyer and Mr. Smith had their telephone call, Mr. Anglemyer was told to not come back to work. Upon learning this, Ms. Perkins emailed Ms. Beuford:

> Can you please confirm something for me? [Mr. Anglemyer] has just informed me that [Mr. Smith] is asking that he take time off and return on the 11th due to the Cris Shaw incident. I have to be frank. This makes me very uncomfortable and I feel like I am not in the loop. If [Mr. Smith] is fearful for [Mr. Anglemyer's] safety I am also fearful for mine, should I take time off too?

Ms. Beuford responded to this email by calling Ms. Perkins and directing her to hide out at 800 New Jersey Avenue, S.E., D.C. until things "cool down."

27. Sometime between June 19, 2017 and June 29, 2017, Bonnie Anglemyer, Mr. Anglemyer's wife, spoke with Mr. Smith and expressed concern about the safety of the Anglemyer home.

7

28.     On July 2, 2017 Ms. Perkins confronted Mr. Christopher about the incident with Mr. Shaw. Mr. Christopher claimed that the position he took in his report to human resources was "not lying" but "just not recalling" what was said by Mr. Shaw on June 15, 2017. He also reminded Ms. Perkins that he told her she should have shredded her letter of June 19, 2017 about Mr. Shaw instead of pushing the issue forward.

29.     After that conversation, Ms. Perkins was re-assigned from her office job to the field. She was directed to no longer work in the office at 3303 Stanton Road, S.E., D.C. She now worked in a trailer with no toilet or running water at 800 New Jersey Avenue, S.E., D.C. She was the only woman working at that site. Around this time, Mr. Smith promoted Mr. Shaw to Vice President of Operations. Mr. Shaw was now Ms. Perkins' supervisor.

30.     On July 10, 2017, a field supervisor, Marty Schaffer, directed Ms. Perkins to go to 3303 Stanton Road, S.E., D.C. to pick up shirts and checks. Ms. Perkins did so. While she was there, she had a very uncomfortable encounter with Mr. Shaw.

31.     On the morning of July 11, 2017, Ms. Perkins emailed Ms. Beuford again. She told Ms. Beauford that she felt threatened by Mr. Shaw in the hallway at 3303 Stanton, S.E., D.C. Ms. Beuford responded that she informed Mr. Smith and the new president of WCS Construction, D. Scott Vossler, of her concern.

32.     On July 14, 2017, Ms. Perkins had a meeting with Mr. Vossler at 3303 Stanton Road, S.E., D.C. Mr. Vossler told Ms. Perkins that he knew about the difficulty between Ms. Perkins and Mr. Shaw, but that he was not going to get into it or do anything more about it. Ms. Perkins was told by Mr. Vossler that she would now be a "field employee." As a field employee, Ms. Perkins would now be on call 24/7 for construction emergencies. She no longer had her office job.

33. On July 20, 2017, Ms. Perkins reached out to Ms. Beuford again. Ms. Perkins complained again that by Human Resources revealing her workplace violence complaint, she felt she was being unfairly demoted and targeted for dismissal.

34. On July 20, 2017, Ms. Perkins emailed Mr. Vossler because she was no longer invited to work place lunches or to the birthday that was planned for her at 3303 Stanton Road S.E., D.C. in her former office. Only office employees get to attend the birthday lunch. Field employees are not invited in. Her office mates had been texting and calling her why she was missing her birthday lunch. She didn't know what to tell them.

35. On the morning of July 21, 2017, Mr. Shaw reported to the trailer where Ms. Perkins had been working and directed the supervisor, Mr. Schaffer, to remove everyone from the trailer. Ms. Perkins continued to do her work from her personal automobile. At around 9:00 a.m., Ms. Perkins reported to Ms. Beuford, that Mr. Shaw had evicted her from her work trailer and that she did not know what to do. Later that afternoon, Ms. Perkins was summoned by Ms. Beuford to Mr. Smith's office at 1100 New Jersey Avenue, S.E, D.C. During this meeting Ms. Beuford confirmed that Mr. Christopher heard Mr. Shaw threaten a "suicide by cop" scenario on June 15, 2017. Ms. Perkins expressed her concerns that she was being retaliated because Human Resources disclosed her confidential complaint about Mr. Shaw to Mr. Shaw.

36. On August 8, 2017 Ms. Perkins called the Metropolitan Police Department about this incident with Mr. Shaw. She was concerned because he continued to intimidate her and nothing was being done.

37. On August 22, 2017, Ms. Perkins was terminated by the Defendants.

38. The decision to terminate Ms. Perkins was not made by the former president and her supervisor, Mr. Anglemyer.

39. The decision to terminate Ms. Perkins was made by someone other than Mr. Vossler, President of WCS, who denied having any input in the decision to terminate Ms. Perkins.

40. By deduction, the decision to terminate Ms. Perkins was made by defendant W. Christopher Smith, who was upset with the negative attention her complaints brought to his companies and to his business. Ironically, had his companies and businesses adhered to the confidentiality promised to Ms. Perkins, this issue would not have been raised. This deviation from policy and from commonsense, suggests strongly the motivation behind the decision to terminate Ms. Perkins was animated with spite and ill-will.

41. The way Ms. Perkins was treated, for doing nothing more than what is required of her under law and in good faith, demonstrates a callous disregard for the safety of others. One can only pray that a worker would report what Ms. Perkins reported under these circumstances.

42. A worker can bring a wrongful discharge claim under the public policy exception of the at-will employment doctrine for reporting an employer's conduct. *Freas v. Archer Services, Inc.*, 716 A. 2d 998 (D.C. Ct App 1998).

43. A worker may also bring a wrongful discharge claim for being terminated for reporting a co-worker's illegal conduct. *See Washington v. Guest Services, Inc*. 718 A 2d 1071 (1998).

44. These public policies are embodied in D.C. Code § 22-404(a)(1) which states "whosoever unlawfully assaults, or threatens another in a menacing manner"; § 22-13-1 which prohibits "affray"; 22-1810 which declares it a felony against "whosoever threatens … within the District of Columbia … to injure the person of another;" and D.C. Code § 22-1931 which prohibits the interfering of any criminal report to a law enforcement agency. This sampling of violated public policies is not exhaustive, but merely illustrative.

45. Furthermore, these criminal statutes were enacted to protect the personal freedoms, health, safety, and welfare of the general public.

46. Because Ms. Perkins was discharged for reporting a criminal threat, and was a member of the general public whom the criminal statues were designed to protect, the discharge violates public policy.

47. Intentional torts such as a claim for wrongful discharge in violation of public policy necessarily carry the specter of punitive damages. *Daka, Inc. v. McCrae*, 839 A.2d 682 (D.C. 2003).

48. As a direct and proximate result of the acts and omissions of the Defendants in unlawfully discharging Plaintiff, Plaintiff has suffered economic and emotional injuries including, but not limited to, lost salary, lost employee benefits, lost raises, loss of reputation, shame, embarrassment, humiliation, pain, suffering, mental anguish, anxiety, and distress.

49. In doing those acts alleged herein, Defendants' conduct was willful and wanton and demonstrated maliciousness and demonstrated a conscious disregard for the Plaintiff's rights including her right to personal safety, as well as the rights of others, i.e., John Davies, with reckless indifference to the consequences which Defendants were aware of, from their knowledge of existing circumstances and conditions, that their conduct probably would result in injury to another.

WHEREFORE, Plaintiff respectfully pray this Court enter judgment against Defendants, as follows:

1. Compensatory damages in the amount of $1,000,000, together with prejudgment interest on said amount;

2. Back pay together with prejudgment interest, reimbursement for lost fringe benefits, training and promotional opportunities, cost of obtaining new employment, lost future wages, and other appropriate relief to redress the unlawful practices complained of herein for each plaintiff;

3. Punitive damages in an amount of $3,000,000;

4. An award for attorneys' fees and costs incurred in pursuing this action; and

5. An award of such further relief as the Court may deem appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.

Date: March 24, 2018.

Respectfully Submitted,<br>
Plaintiff<br>
By Counsel

/s/
Matthew T. Sutter, DC Bar No. 477910
Sutter & Terpak, PLLC
7540A Little River Turnpike
Annandale, VA 22003
Telephone: 703-256-1800
Facsimile: 703-991-1661
Email: matt@sutterandterpak.com
Counsel for Plaintiff