UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JACQUELINE C. PERKINS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-751 (RC) |
| | : | | |
| v. | : | Re Document No.: | 7 |
| | : | | |
| WCS CONSTRUCTION, LLC, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING DEFENDANTS' MOTION TO DISMISS

### I. INTRODUCTION

In this wrongful termination case, Plaintiff Jacqueline C. Perkins ("Perkins") brought suit alleging that Defendants WCS Construction LLC ("WCS Construction"), WCS Construction Development LLC ("WCS Development"), William C. Smith & Co., Inc. (WCS Inc.), and W. Christopher Smith ("Smith") wrongfully discharged her from her employment after she reported threats made by another WCS Construction employee. Defendants have moved to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons stated below, the motion to dismiss is denied.

### II. FACTUAL BACKGROUND[1]

Perkins was hired as an assistant project manager at WCS Construction on February 19, 2016. *See* Compl. ¶ 13, ECF No. 1. At some point in the next year, she was promoted to

---

[1] When considering a motion to dismiss for failure to state a claim, the court "accepts the allegations of the complaint as true." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). The Court may also consider "documents attached as exhibits or incorporated by reference in the complaint[.]" *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d

assistant to the president of WCS Construction, Jim Anglemyer ("Anglemyer"). *See id.* Perkins worked "in a professional office setting" at WCS Construction's main offices at 3303 Stanton Road SE, Washington, D.C. 20020. *Id.* ¶ 13.

On June 15, 2017, Perkins attended a meeting with Anglemyer, Michael Christopher ("Christopher"), the CFO of WCS Construction, and Christopher Shaw ("Shaw"), the Vice President of WCS Construction. *See id.* ¶ 17. The meeting concerned the finances of a WCS Construction project with the Federal Realty Investment Trust, a client based in Rockville, Maryland. *See id.* After Anglemyer left early due to a scheduling conflict, Perkins alleges that Shaw "began making specific, violent threats against John Davies of the Federal Realty Investment Trust." *Id.* According to Perkins, Shaw first said he would "drive down to Mr. Davies' office, take out his gun, and shoot himself in the head." *Id.* After Perkins asked Shaw if he was serious, Shaw replied that he would kill himself "only after I shoot John [Davies] first." *Id.* Shaw repeated that he would kill himself after shooting John Davies, after which the meeting ended. *Id.*

Following the meeting, Perkins consulted WCS Construction's employee handbook, which suggested that employees could anonymously report actual or threatened violence, and that employees would not be disciplined or retaliated against for raising good faith concerns. *See id.* ¶ 18. Relying on the handbook, Perkins delivered a letter to Christopher the next Monday, on June 19, 2017. *See id.* In the letter, she stated that at an "unofficial meeting in [Anglemyer's] office regarding FRIT" on June 15, 2018, Shaw had said he "felt like driving down to the FRIT office and taking his gun and shooting himself in the head." June 19, 2017 Perkins Letter, Ex. A,

---

117, 119 (D.D.C. 2011) (internal quotation marks omitted) (quoting *Gustave–Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002)).

ECF No. 1-1. Perkins said when she questioned Shaw, he stated that "'after I shoot him first,' referring to John Davis, . . . 'I'll kill myself in front of the building.'" *Id.* She concluded that she felt she needed to document the incident because she could not live with herself if the threats materialized. *See id.*

When Perkins delivered the letter, Christopher told her to throw it away. *See* Compl. ¶ 18. When she insisted, he told her that he did not want to deal with it and to discuss it with Anglemyer. *See id.* Perkins gave Anglemyer the letter and stated that she was going to call the police, following which, at Anglemyer's direction, she also submitted it to the office manager for WCS Construction. *See id.* ¶ 19–20. The letter was ultimately forwarded to WCS Inc.'s human resources department, which also handled HR issues for WCS Construction. *See id.* ¶ 19, 22. As part of the following investigation, Shaw was contacted by WCS Inc. HR. *See id.* ¶ 23.

On June 29, 2017, Federal Realty Investment Trust asked that Shaw no longer work on any of its projects. *See id.* ¶ 25. The same day, Smith had an angry conversation with Anglemyer regarding the incident, with Anglemyer pointing out that Smith was "sweeping this under the rug" and that Perkins was involving the police. *Id.* Anglemyer was asked to take a two-week leave of absence the same day, while Perkins was directed to temporarily relocate from her office to a trailer on a work site at 800 New Jersey Avenue SW "until things 'cool down.'" *Id.* ¶ 26. On July 2, 2017, after Christopher told her in a meeting that she "should have shredded her letter . . . instead of pushing the issue forward[,]" *id.* ¶ 28, Perkins was permanently reassigned from WCS Construction's main offices to the trailer at 800 New Jersey Avenue SW, *see id.* ¶ 29.

On July 10, 2017, Perkins had a "very uncomfortable encounter" with Shaw at WCS Construction's main office. *Id.* ¶ 30. She expressed concerns to WCS Construction's office

manager, who communicated those concerns to Smith and WCS Construction's new president, D. Scott Vossler ("Vossler"). *See id.* ¶ 31. On July 14, 2017, Perkins attended a meeting with Vossler, who informed her that she would now be a "field employee[,]" on call 24/7 for construction emergencies. *Id.* ¶ 32. On July 21, 2017, Shaw reported to the trailer where Perkins was working and asked all employees to leave the trailer. *See id.* ¶ 35. Perkins again contacted, and later attended a meeting with, WCS Construction's office manager, where she complained that she was being retaliated against following her complaint about Shaw. *See id.* On August 8, 2017, Perkins called the Metropolitan Police Department about the June 15, 2017 incident with Shaw. *See id.* ¶ 36. On August 22, 2017, she was terminated. *See id.* ¶ 37.

Perkins filed a complaint in this case on April 3, 2018, alleging that she was wrongfully discharged and seeking compensatory damages, back pay, and punitive damages. *See id.* at 11–12. Defendants jointly filed a motion to dismiss on May 25, 2018. *See* Defs.' Mot. Dismiss, ECF No. 7. Plaintiff filed her opposition on June 8, 2018, *see* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 8, and Defendants filed their reply on June 22, 2018, *see* Defs.' Reply to Opp'n, ECF No. 10.

### III. LEGAL STANDARD

To prevail on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff need only provide a "short and plain statement of [her] claim showing that [she is] entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the ... claim is and the grounds upon which it rests[,]" *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (per curiam) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*,

4

416 U.S. 232, 236 (1974). In considering such a motion, the "complaint is construed liberally in the plaintiff['s] favor, and [the Court] grant[s] plaintiff[ ] the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint to prevail on the motion. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

## IV. ANALYSIS

In their motion to dismiss, Defendants argue that Perkins's complaint does not state a claim upon which relief can be granted because her claim for wrongful discharge does not fall within a public policy exception to the at-will employment doctrine, which generally allows an employer to terminate an employee for any reason or no reason at all. *See* Defs.' Mem. Supp. Mot. Dismiss at 1–2, ECF No. 7-1. Perkins argues that she has identified specific public policies

5

that Defendants violated by terminating her. *See* Pl.'s Mem. Opp'n at 2–3. Ultimately, the Complaint alleges that Perkins reported Shaw's conduct internally and to the police, and clearly identifies criminal statutes that either Shaw's or Defendants' conduct allegedly violated. The allegations in the Complaint also reasonably suggest a causal connection between Perkins's internal report and her firing. Because the Complaint sufficiently alleges that, although Perkins is an at-will employee, the at-will doctrine does not apply to her termination because she falls under a public policy exception, the Court denies the motion to dismiss.

Under the at-will employment doctrine, the general rule in the District of Columbia is that at-will employees like Perkins "may be discharged 'at any time and for any reason, or for no reason at all.'" *Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 27 (D.D.C. 2015) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991)). While the parties devote a significant portion of their briefs to discussing the principles of wrongful discharge claims and the public exception to the at-will employment doctrine recognized in the District of Columbia, they appear to be in agreement as to the elements of a claim brought under such an exception.

Under the initial, narrow public policy exception recognized in *Adams*, an at-will employee can bring a claim for wrongful termination against her employer when the employee was discharged for refusing to violate the law. *See* 597 A.2d at 34. And under the expanded public policy exception later developed in *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997), an at-will employee can also bring a wrongful termination claim when she "acted in furtherance of a public policy 'solidly based on a statute or regulation . . . , or (if appropriate) on a constitutional provision concretely applicable to the defendant's conduct[,]'" *Myers v. Alutiiq Int'l Solutions, LLC*, 811 F. Supp. 2d 261, 266–67 (D.D.C. 2011) (quoting *Carl*, 702 A.2d at 163

(Terry, J., concurring)),[2] and was terminated as a result. The employee must both 1) identify in the Complaint "'some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution,'" and 2) show that there is "a 'close fit between' the policy 'and the conduct at issue in the allegedly wrongful termination.'" *Clay*, 128 F. Supp. 3d at 27 (quoting *Davis v. Cmty. Alternatives of Washington, D.C.*, 74 A.3d 707, 709–10 (D.C. 2013)). Implied in the "close fit" analysis is the notion that "[the] protected activity was the predominant cause of [the] termination." *Davis*, 74 A.3d at 710. The D.C. Court of Appeals has emphasized that the exception remains narrow—an asserted public policy exception under *Carl* must be "firmly anchored" in a law that reflects the particular public policy relied on, in order to avoid the public policy exception swallowing the at-will doctrine. *Carl*, 702 A.2d at 162 (Terry, J., concurring).

Since *Carl*, courts have recognized claims for wrongful discharge in violation of public policy in a variety of settings, including when employers retaliated against employees who reported illegal conduct, *see, e.g.*, *Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 20–21 (D.D.C. 2002) (finding valid claim when public policy against taxpayer subsidization of private political activity allegedly violated by firing of employee who reported nonprofit's tax code violations), *Washington v. Guest Servs., Inc.*, 718 A.2d 1071, 1080–81 (D.C. 1998) (finding valid claim when public policy proscribing preparation of contaminated food allegedly violated by firing of hospital employee who reported food code violations), filed certain types of lawsuits, *see Freas v. Archer Servs., Inc.*, 716 A.2d 998, 1000–02 (D.C. 1998) (finding valid claim when public policy against termination of employees who file complaint relating to minimum wages

---

[2] "Relying on *Carl v. Children's Hospital*, courts have treated Judge Terry's concurring opinion as the relevant standard." *Vreven v. American Ass'n of Retired Persons*, 604 F. Supp. 2d 9, 14 n. 5 (D.D.C. 2009).

allegedly violated by firing of employee who instituted class action), or participated in the legislative process, *see Carl*, 702 A.2d at 162 (Terry, J., concurring) (finding valid claim when public policy against punishment of individuals who testify before D.C. Council allegedly violated by firing of nurse who advocated for patients' rights before D.C. Council).

Defendants argue, *see* Defs.' Mem. Supp. at 11, and Perkins does not contest, that she does not adequately plead the narrow exception articulated in *Adams*. Defendants also argue that Perkins fails the expanded *Carl* test because she 1) has not pointed to a sufficiently clear public policy in her complaint, and 2) has not pled facts that "creat[e] a plausible inference" of a close fit between any public policy and the conduct alleged to have led to her termination. *Id.* at 13–14. The Court addresses each argument in turn.

### A. Clear Public Policy

Defendants' first argument for dismissing Perkins's claim is that her claim does not fall under *Carl*'s extended exception because the complaint fails to "tie her claim to public policy rooted in any statute." Defs.' Mem. Supp. at 13. In response, Perkins argues that she has met the first prong of the *Carl* expanded exception because the four criminal statutes she identified in her complaint are sufficient to constitute "a 'clear showing' of public policies" her wrongful termination claim relies on. Pl.'s Mem. Opp'n at 9. After reviewing the standard for meeting the first prong of the *Carl* public policy exception, and considering the arguments put forth by the parties, the Court finds that Perkins has sufficiently tied her claim to a public policy to survive the motion to dismiss.

#### 1. The Public Policy Requirement Under *Carl*

In the two decades since *Carl*, courts in D.C. and in this circuit have painted a somewhat confusing picture of what constitutes a public policy sufficiently rooted in law to give rise to a

claim for wrongful termination in violation of public policy. Perhaps as a result, Perkins and the Defendants spend a significant amount of time in their briefs talking past each other, and making arguments based on their own interpretation of the standard without considering the other party's interpretation. Before addressing the parties' contentions, the Court briefly summarizes how courts have interpreted *Carl*'s requirement that a wrongful discharge claim be based on an identifiable public policy "solidly based on a statute or regulation[.]" *Carl*, 702 A.2d at 163 (Terry, J., concurring).

When reviewing claims for wrongful discharge in violation of public policy under D.C. law, courts have generally found a viable public policy to be involved in two types of situations: 1) termination for engaging in an activity when the employee points to a law that reflects a policy prohibiting retaliation against an individual for engaging in the type of activity the employee was engaged in, *see, e.g.*, *Freas*, 716 A.2d at 1000–02; *Carl*, 702 A.2d at 161, and 2) termination for reporting illegal conduct when the employee points to "specific laws or regulations that clearly reflect a policy prohibiting the activity about which the employee complained, whether or not the employer actually violated the law or regulation[,]" *Leyden v. Am. Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 249 (D.D.C. 2015); *see, e.g.*, *Riggs*, 203 F. Supp. 2d at 20–21; *Guest Servs.*, 718 A.2d at 1080–81.

With regards to termination in violation of a public policy prohibiting retaliation against an individual who has engaged in a particular type of activity, the D.C. Court of Appeals has made clear that the employee does not need to point to a law prohibiting the exact conduct the employer engaged in to prevail on a wrongful discharge claim. Judge Terry explained in *Carl* that what matters is whether the conduct the employer engaged in "is sufficiently within the scope of the policy embodied in the statute[.]" *Carl*, 702 A.2d at 165 (Terry, J., concurring). In

9

*Carl*, an employee was terminated after testifying before the D.C. Council, and she pointed to a criminal statute prohibiting influencing, intimidating, or impeding testimony before the D.C. Council, or injuring a witness in his person or property "on account of his . . . testifying[.]" *Id.* at 160 n. 2 (quoting D.C. Code § 1-224 (1992)). Judge Terry noted that the Court of Appeals "would be hard-pressed to conclude that [the employer] violated this criminal statute." *Id.* at 165. However, the statute embodied a public policy to shield witnesses before the D.C. Council from retaliation, and the termination was sufficiently within the scope of that policy for the plaintiff to survive a motion to dismiss. *See id.*

With respect to termination for reporting illegal conduct, courts within this circuit have adopted different views of what is required for statutes of general applicability to embody a public policy that can give rise to a wrongful discharge claim. The two most applicable D.C. Court of Appeals cases on the issue involved the reporting of conduct prohibited under a narrow regulatory regime, *see Guest Servs.*, 718 A.2d at 1080–81 (finding specific public policy embodied in D.C. health and food regulations); *see also Liberatore v. Melville Corp.*, 168 F.3d 1326, 1331–32 (D.C. Cir. 1999) (applying reasoning of *Guest Servs.* to federal drug safety regulations), and a more general statute coupled with a mandatory reporting requirement, *see Fingerhut v. Children Nat'l Med. Ctr.*, 738 A.2d 799, 806–07 (D.C. 1999). In *Fingerhut*, the Court of Appeals found that the plaintiff, a special police officer employed by a medical center, properly alleged that his termination violated public policy when he was terminated for reporting bribery at the medical center both internally and to the D.C. police. *See id.* In support of his argument, the plaintiff had pointed both to a general criminal statute prohibiting bribery of government officials and to a statute prohibiting police officers from concealing information

relating to suspected criminal activity, which essentially functioned as a mandatory reporting requirement for police officers. *See id.*

A few years after *Fingerhut*, the district court in *Riggs* found that 26 U.S.C. § 501(c)(3), a tax code provision generally setting the conditions for a type of tax-exempt status, embodied a sufficiently specific public policy against the subsidization of private political activity by taxpayers to sustain a wrongful discharge claim. *See* 203 F. Supp. 2d at 20–21. The plaintiff in *Riggs* alleged that he was fired for reporting violations of § 501(c)(3), but was not subject to any reporting requirement, unlike the plaintiff in *Fingerhut*. *See id.* The court found that he had stated a claim and denied the defendant's motion to dismiss. *See id.* In *Vreven v. American Ass'n of Retired Persons*, another district court followed *Riggs* to find that 26 U.S.C. § 501(c)(4), a tax code provision setting conditions for another form of tax-exempt status, similarly embodied a public policy that could give rise to a wrongful discharge claim, even absent a separate reporting requirement for the plaintiff alleging violations of the provision. 604 F. Supp. 2d 9, 14 (D.D.C. 2009).

By contrast, when examining statutes of general applicability that are not a part of specific regulatory regimes like the food safety statute and regulations at issue in *Guest Servs.*, 718 A.2d at 1080–81, some district courts *have* looked to whether a separate reporting mandate was also present. *See, e.g.*, *Clay*, 128 F. Supp. 3d at 28–29; *Myers*, 811 F. Supp. 2d at 266–67. In *Myers*, the district court found a sufficiently specific public policy involved when, *inter alia*, the plaintiff pointed to several federal statutes that encouraged employees to come forward and report the type of conduct he had been fired for reporting. *See Myers*, 811 F. Supp. 2d at 266–67. In *Clay*, the district court reviewed a claim for wrongful discharge based on a public policy allegedly embodied in criminal fraud statutes. *See* 128 F. Supp. 3d at 28–29. The court

explicitly rejected the holding of *Riggs* and *Vreven*, and found that absent "a mandatory reporting requirement or narrowly focused regime[,]" a statute of general applicability like a criminal fraud statute did not embody a sufficiently specific public policy to support a wrongful discharge claim. *Id.* The court explained that "[t]o rest a claim of wrongful discharge on such an expansive public policy would enable the exception to swallow the rule." *Id.* at 29.

### 2. Application to Perkins's Claims

In this case, Perkins appears to be invoking both strands of the *Carl* public policy exception. Perkins points to three statutes in her Complaint that relate to actions by Shaw that she reported, criminalizing assault and threatened assault (D.C. Code § 22-404(a)(1)), affray (D.C. Code § 22-1301), and threatened kidnapping or injury to another or their property (D.C. Code § 22-1810). *See* Compl. ¶ 44. Perkins states in her Complaint that "[a] worker may . . . bring a wrongful discharge claim for being terminated for reporting a co-worker's illegal conduct[,]" *id.* ¶ 43, and that "[b]ecause [she] was discharged for reporting a criminal threat . . . , the discharge violates public policy," *id.* ¶ 46. However, Perkins's claim also relies on a statute that relates to her termination for engaging in a particular activity, interfering with a criminal report to a law enforcement agency (D.C. Code § 22-1931). *See id.* ¶ 44. She makes this clear when she argues in her opposition that Defendants' conduct after she reported the incident internally and mentioned that she would call the police could be considered intimidation, in violation of the public policy embodied in § 22-1931. *See* Pl.'s Mem. Opp'n at 10–11.

Defendants make two arguments against finding a public policy justifying a wrongful discharge claim. They argue both that the criminal statutes Perkins cites are completely unconnected to the events that gave rise to her wrongful discharge claim, and that even if they

12

are somehow relevant to that claim, they do not embody a sufficiently clear public policy to support it. The Court disagrees as to both.

In their briefs, Defendants first contend that the criminal statutes Perkins points to are entirely unconnected to her claim for wrongful discharge, and that it is "unclear how these statutes could even be applicable to the facts of the Complaint." Defs.' Mem. Supp. at 13 n. 2, *see also* Defs.' Reply at 9. Perkins argues, and the Court agrees, that it is in fact quite clear how at least some of the statutes relate to her claim.[3] *See* Pl.'s Mem. Opp'n at 10. First, Perkins points to two sections of the D.C. Code criminalizing threatened assault or injury to another, which is essentially what she alleges Shaw did during the June 15, 2017 meeting.[4] *See* Compl. ¶ 17. Second, Perkins points to a D.C. Code section criminalizing the "use [of] . . . intimidation to block access to any telephone, radio, computer, or other electronic . . . device with a purpose to . . . interfere with . . . the report of any criminal offense to any law enforcement agency[.]" D.C. Code § 22-1931(a)(1). Perkins argues in her opposition that Defendants' conduct after she indicated her intent to contact the police following the June 15, 2017 meeting was tantamount to

---

[3] The Court is not entirely convinced that affray is applicable to the facts of Perkins's complaint. Perkins argues that "[u]nder common law, a person is guilty of affray if he uses or threatens unlawful violence towards another and his conduct . . . would cause a [reasonable] person . . . to fear for his personal safety[,]" and points to a North Carolina case, *In re May*, 584 S.E. 2d 271, 273–74 (N.C. 2003). Pl.'s Opp'n at 10 n. 3. However, *In re May* states that an affray is typically understood at common law as "a fight between two or more persons in a public place so as to cause terror to the public." 584 S.E. 2d at 274. The other case cited by Perkins similarly holds an affray to involve a fight between two or more persons. *See In re Drakeford*, 230 S.E. 2d 779, 782 (N.C. App. 1977). The Court does not definitely rule on the issue given that the parties have not otherwise addressed the issue of what constitutes an affray.

[4] Defendants do not argue that Shaw's acts did not constitute threatened assault, or otherwise explain why the D.C. Code sections cited are inapplicable to his conduct.

13

intimidation intended to interfere with her contacting the authorities. *See* Pl.'s Mem. Opp'n at 10–11. Defendants do not substantively engage with Perkins's argument in their reply.[5]

Defendants next argue that the criminal provisions identified by Perkins are not sufficiently specific to point to a public policy that her termination allegedly violated. Defendants point out that the statutes are "general criminal provisions" that "certainly do not 'clearly reflect a policy prohibiting the activity about which the employee complained[.]'" Defs.' Mem. Supp. at 13 (quoting *Herron*, 861 F.3d at 170). Defendants' argument fails because 1) they do not respond to Perkins's argument that her termination could be characterized as intimidation intended to prevent her from alerting the police, and 2) they do not meaningfully engage with Perkins's argument that her reporting of criminal activity invokes a clear public policy embodied in general criminal statutes.

---

[5] Defendants briefly point out that the statute has a "general purpose to prohibit interference with 911 calls for an ongoing emergency." Defs.' Reply at 8. The Court is unconvinced. The statute makes it unlawful for a person to:

> knowingly disconnect, damage, disable, temporarily or permanently remove, or use physical force or intimidation to block access to any telephone, radio, computer, or other electronic communication device with a purpose to obstruct, prevent, or interfere with:
>
> (1) The report of any criminal offense to any law enforcement agency;
>
> (2) The report of any bodily injury or property damage to any law enforcement agency
>
> (3) A request for ambulance or emergency medical assistance to any governmental agency, or any hospital, doctor, or other medical service provider, or
>
> (4) The report of any act of child abuse or neglect to a law enforcement or child welfare agency.

D.C. Code § 22-1931. The statute clearly expresses a purpose to prohibit interference with calls related to an ongoing emergency, but that is not the only conduct it reaches. It may well be that the statute is still inapplicable to the facts of Perkins's claim, but Defendants make no argument to explain why.

First, Defendants argue in their motion to dismiss that Perkins's claims fail because, unlike in cases like *Freas*, 716 A.2d at 1001, Perkins does not point to a statute that bans retaliating against someone for engaging in a particular action. *See* Defs.' Mem. Supp. at 13–14. As discussed above, this argument fails because courts have recognized public policy exception claims in circumstances where all the employee did was report illegal conduct. *See, e.g.*, *Guest Servs*, 718 A.2d at 1080. But even taking Defendants' argument at face value, Perkins's opposition points to D.C. Code § 22-1931, which at a minimum embodies a public policy against intimidating individuals who report crimes to law enforcement. Perkins argues that Defendants' conduct after she reported Shaw's acts could be considered "intimidation[.]" *See* Pl.'s Mem. Opp'n at 11. Defendants fail to address that argument in their reply. The Court is mindful that the employer's conduct need not violate a statutory provision, but rather must be "sufficiently within the scope of the policy embodied in the statute" to trigger the public policy exception. *Carl*, 702 A.2d at 165 (Terry, J., concurring). In the absence of a concrete argument for dismissal, the Court declines to find that § 22-1931 does not express a sufficiently specific policy against interference with, or intimidation of, a person reporting a crime, to trigger the public policy exception to at-will discharge.

Second, Defendants conclusorily argue in their reply that Perkins "pointing generally to 'laws which criminalize . . . is not nearly as specific as the policies at issue in other viable wrongful discharge claims," Defs.' Reply at 10 (quoting *Clay*, 128 F. Supp. 3d at 29), and cite several cases where plaintiffs did not prevail because they did not point to sufficiently specific laws to support their assertion that a public policy was involved, *see id.* at 10–11. Defendants do not explain why the statutes Perkins points to are different from the criminal statute in *Fingerhut*, 738 A.2d at 1000, or the food and drug safety statutes at issue in *Guest Servs.*, 718 A.2d at 1071,

15

and *Liberatore*, 168 F.3d at 1326.  Instead, Defendants simply cite to *Clay* and other cases where wrongful discharge claims were rejected.

As discussed above, the court in *Clay* conducted a lengthy analysis of past wrongful discharge opinions involving employees who reported illegal conduct based on statutes of general applicability, and pointed to uncertainty amongst courts as to whether plaintiffs needed to separately allege that they were subject to a mandatory reporting requirement in order to succeed on such claims.  *See Clay*, 128 F. Supp. 3d at 28–29; *compare Vreven*, 604 F. Supp. 2d at 14 (finding that plaintiff stated claim for wrongful discharge when she was terminated for reporting violation of tax laws), *with Myers*, 811 F. Supp. 2d at 266–67 (finding that plaintiff stated claim for wrongful discharge when he reported violations of federal contracting regulations *and* a separate statute reflected a clear policy encouraging whistleblowing).  The court in *Clay* ultimately concluded that the plaintiff's claimed public policy exception based on criminal fraud statutes alone was too broad and risked "swallow[ing] the rule."  *Clay*, 128 F. Supp. 3d at 29.  In doing so, *Clay* explicitly rejected the reasoning of prior district court decisions in *Riggs* and *Vreven*.  *See id.* at 29 & n. 2.

Defendants do not make any arguments to indicate why the Court should follow *Clay* over *Vreven* and *Riggs*, or why the Court should find that the policy against assault reflected in the statutes[6] cited by Perkins is not sufficiently specific to warrant a public policy exception. And aside from *Clay*, all the cases Defendants cite in their Reply relate to wrongful termination claims that did not involve the reporting of allegedly illegal conduct.  *See Robinson v. Securitas Servs., Inc.*, 819 F. Supp. 2d 18 (D.D.C. 2011) (public policy exception claim not tied to any

---

[6] Defendants acknowledge in their reply that the provisions of the D.C. Code cited by Perkins "identify a general purpose to prohibit interference with 911 calls . . . and make 'kidnapping' and 'assault' criminal offenses."  Defs.' Reply at 8.

statute or regulation); *Lurie v. Mid-Atlantic Permanente Medical Group, P.C.*, 729 F. Supp. 2d 304 (D.D.C. 2010) (public policy exception claim tied to healthcare statutes not applicable to plaintiff); *Chisholm v. Dist. Of Columbia*, 666 F. Supp. 2d 96 (D.D.C. 2009) (public policy exception claim not tied to any statute or regulation); *Davis v. Gables Residential/H.G. Smithy*, 525 F. Supp. 2d 87 (D.D.C. 2007) (same); *Martin v. American Univ.*, No. 98-7174, 1999 WL 1125168 (D.D.C. Nov. 22, 1999) (same).

Because "[i]t is not this '[C]ourt's role . . . to act as an advocate for the [parties] and construe legal arguments on [their] behalf[,]'" *U.S. v. Real Property Identified as: Parcel 03179-005R*, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (quoting *Stephenson v. Cox*, 223 F. Supp. 2d 119, 122 (D.D.C. 2002)), and because Defendants' arguments for dismissal do not meaningfully challenge Perkins's contention that her termination for reporting illegal conduct implicated the public policy exception, the Court also denies the motion to dismiss on this ground.

### B. "Close Fit"

Defendants' second argument in support of dismissal is that Perkins fails the second prong of the *Carl* public policy exception because she cannot establish a close fit between the alleged public policy identified in the criminal statutes she cited and her termination. *See* Defs.' Mem. Supp. at 14–15. Defendants argue that Perkins has not pled facts indicating that her reporting of Shaw's conduct is causally connected to her termination. *See id.*; Defs.' Reply at 11. Perkins responds that it is "well-established that issues of causation in an intentional tort claim are not ripe for a decision without a factual record[,]" and argues that she has adequately pled causation. Pl.'s Mem. Opp'n at 12. The Court agrees.

"Courts in this Circuit, interpreting the DCCA's decision in *Carl*, have required not only that a plaintiff clearly articulate the applicable public policy, but also show a causal connection

between protected activity in which that plaintiff engaged and his or her termination." *Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 126 (D.D.C. 2012) (citing *Robinson*, 819 F. Supp. 2d at 20–21). As the court explained in *Robinson*, "to fall within the public-policy exception, [Perkins] must have been terminated for acting in a protected manner." 819 F. Supp. 2d at 21. Courts reviewing public exception claims have usually focused on whether the employer provided any evidence of an alternate reason for the employee's termination. *See, e.g.*, *Robinson*, 819 F. Supp. 2d at 20–21 (finding no causal link when evidence that employee fired for deficient performance); *Brathwaite v. Vance Federal Sec. Servs., Inc.*, 613 F. Supp. 2d 38, 50 (D.D.C. 2009) (finding no causal link when evidence that employee fired for instigating fight with another employee). At least two courts have applied the *McDonnell-Douglas* framework in analyzing claims for wrongful discharge in violation of public policy, and have correspondingly imported the temporal proximity standard used for Title VII claims in this Circuit to such wrongful discharge claims. *See Owens v. National Medical Care, Inc.*, 337 F. Supp. 2d 131, 137 (D.D.C. 2004); *Taylor v. Washington Metropolitan Area Transit Auth.*, 109 F. Supp. 2d 11, 16 (D.D.C. 2000).

In their motion to dismiss, Defendants argue that Perkins has not pled causation because she "[did] not indicate that her employer even knew she had called the police[.]" Defs.' Mem. Supp. at 15. In their reply, they further argue that the Complaint fails to articulate facts that show her reporting of Shaw's conduct caused her termination. *See* Defs.' Reply at 11. Perkins points out in opposition that she alleged facts in the Complaint indicating that she was a stellar employee who was terminated within two months of reporting the incident with Shaw on June 15, 2017. Pl.'s Mem. Opp'n at 14. She argues that "the circumstantial facts [she] identified may be sufficient . . . to allow a jury to find in [her] favor[,]" particularly when the close temporal

18

proximity between her internal report and her termination further provides an inference of retaliation *Id.* The Court agrees.

After being hired in 2016, Perkins was "promoted to be the assistant of the president of WCS Construction," Compl. ¶ 13. "By all accounts [she] met and exceeded the expectations of her employer." *Id.* ¶ 14. On June 15, 2017, she attended the meeting at which Shaw allegedly made threats against a client of WCS Construction. *See id.* ¶ 17. On June 19, 2018, Perkins informed Christopher that she would be calling the police regarding the incident. *See id.* ¶ 18. On June 29, 2017, Smith was made aware that Perkins was "involving the police[,]" *id.* ¶ 25, and Perkins was directed to temporarily relocate to a construction site while the Shaw situation cooled down, *see id.* ¶ 26. Just three days later on July 2, 2017, Perkins was reprimanded for "pushing the [Shaw] issue forward" by Christopher, *id.* ¶ 28, and was permanently re-assigned from her office to the construction site, *see id.* ¶ 29. And a little over a week later, at a meeting with Vossler where Perkins's claims against Shaw were discussed, her job duties were changed to "field employee." *Id.* ¶ 32. After multiple further communications between Perkins and various employees of WCS Construction regarding the incident, *see id.* ¶¶ 33–35, Perkins was terminated on August 22, 2017, just two months after she first reported Shaw's behavior, *see id.* ¶ 37. Defendants do not argue that Perkins's performance as an employee was inadequate, challenge the timeline of events alleged by Perkins, or provide any other explanation for Perkins's termination.

While both parties dedicate very little time or analysis to this issue, the Court concludes that Perkins has sufficiently pled causation to survive the motion to dismiss. The facts alleged show that Perkins was performing well, and faced a succession of changes in her employment, culminating in her termination, within a very short period of time after she reported Shaw's

behavior and indicated her intent to alert the police. As Perkins—however succinctly—mentions in her opposition, it is well-recognized in the Title VII context that temporal proximity can support causation at the motion to dismiss stage. *See, e.g.*, *BEG Investments, LLC v. Alberti*, 144 F. Supp. 3d 16, 23 (D.D.C. 2015) ("[B]ecause 'the close temporal proximity of the protected behavior and the alleged retaliation' suggest[s] that a causal relationship exists between the two, '[n]o more is necessary to survive Rule 12(b)(6) dismissal.'" (quoting *Saint–Jean v. District of Columbia,* 846 F. Supp. 2d 247, 259 (D.D.C. 2012))). Absent any indication that Perkins's dismissal was for non-retaliatory reasons, and with the complaint pointing to a series of events starting after Perkins reported the June 15, 2017 incident and culminating with her termination less than two months later, *see* Compl. ¶¶ 18–37, the Court finds that Perkins has sufficiently alleged a causal connection to survive the motion to dismiss.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is hereby **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  November 5, 2018                                          RUDOLPH CONTRERAS
                                                                  United States District Judge