UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JACQUELINE C. PERKINS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-751 (RC) |
| | : | | |
| v. | : | Re Document No.: | 19 |
| | : | | |
| WCS CONSTRUCTION, LLC, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I. INTRODUCTION**

In this wrongful termination case, Plaintiff Jacqueline C. Perkins ("Perkins") claims that Defendants—her direct employer, WCS Construction LLC ("WCS Construction"), plus related persons and entities (WCS Construction Development LLC, William C. Smith & Co., Inc., and W. Christopher Smith)—illegally fired her after she reported violent threats made by a fellow employee. After extensive discovery, Defendants now move for summary judgment. For the reasons stated below, the Court will deny the motion and allow the matter to proceed to trial.

**II. BACKGROUND**[1]

Ms. Perkins began working at WCS Construction on February 17, 2016. Defs.' Statement of Material Undisputed Facts ("Defs.' SOF") ¶ 1, ECF No. 19-1. WCS Construction is a general contractor that oversees commercial and residential construction projects and has about seventy-five employees. *Id.* ¶ 2. WCS Construction "works closely with" William C.

---

[1] Except where noted, the facts recited here are uncontested by the parties. Both parties' statements of facts contain extensive detail and additional narrative; the Court focuses on the facts sufficient to resolve the motion.

Smith & Co., Inc., a real estate development corporation. *Id.* ¶¶ 2–3. Both entities are owned by the same individual, W. Christopher Smith, Jr., and share the same human resources department. *Id.* ¶¶ 3, 27. Ms. Perkins initially worked as an Assistant Project Manager, but she assumed a new role in March 2017, when she became the Executive Assistant to the then-President of WCS Construction, Jim Anglemyer. *Id.* ¶¶ 4, 6.

The incident at the heart of this lawsuit allegedly took place on Thursday, June 15, 2017. *Id.* ¶ 11. As Ms. Perkins recounts in deposition testimony, she was sitting in Mr. Anglemyer's office when Christopher "Cris" Shaw, the Vice President of Operations at WCS Construction, came in to discuss the finances of a project with the Federal Realty Investment Trust ("FRIT"). *Id.* At some point, Mr. Anglemyer left and Mr. Michael Christopher, the CFO, came in and spoke with Mr. Shaw. *Id.* ¶¶ 12–13. During their conversation, Mr. Shaw said that he was "going to drive down to Mr. Davies' [an FRIT employee] office, take out his gun, and shoot himself in the head." *Id.* ¶ 13. Ms. Perkins stopped typing and said: "What?" *Id.* ¶ 14. Mr. Shaw then clarified: "Well, after I shoot John Davies." *Id.* Mr. Shaw and Mr. Christopher then finished up their conversation and left Mr. Anglemyer's office. *Id.* ¶ 15.

Ms. Perkins later testified that, because she knew that Mr. Shaw possessed firearms, she was afraid that he might act on his comments. Pl.'s Mem. in Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Opp'n") ¶ 105, ECF No. 20. Mr. Shaw does indeed own several firearms. *Id.* ¶ 125. Accordingly, four days after the incident (on Monday, June 19), Ms. Perkins submitted a letter to Mr. Christopher (who was not her supervisor or in Human Resources) and voiced her concerns to him. Defs.' SOF ¶ 21. The letter relayed the comments made by Mr. Shaw and concluded:

> This was a very odd and alarming thing to hear in this day and age, even for a construction company. After discussing this long and hard over the weekend with my boyfriend, he insisted that I document this if in fact it should ever happen. If this would actually occur, I could not live with myself and my conscious. Please allows

[sic] this letter to serve as my recount of the event and recommend the next steps of action.

*Id.* ¶ 20.  Ms. Perkins testified that Mr. Christopher "told her to rip it up and throw it away" and said, "I'm not getting involved."  Pl.'s Opp'n ¶ 106.  Defendants maintain that Mr. Christopher, "while disagreeing with Plaintiff's assessments and characterizations of Mr. Shaw's comments," merely "recommended that she consult either Mr. Anglemyer (because he was Plaintiff's supervisor and President of the company) or Human Resources."  Defs.' SOF ¶ 21.

That same day, Ms. Perkins later gave the letter to her office manager, who forwarded it to Human Resources.  *Id.* ¶¶ 26–27.  HR then launched an inquiry, interviewing both Mr. Christopher and Mr. Shaw, but was unable to confirm Ms. Perkins's account of the meeting.  *Id.* ¶¶ 30–31.  Nonetheless, HR informed Mr. Shaw that any comments about violence, even if made in jest, were inappropriate in the workplace, and warned him against taking any action against Ms. Perkins for reporting the incident.  *Id.* ¶ 31.  On June 21, an HR representative notified Ms. Perkins that HR had investigated and "taken the necessary next steps and precautions," thanked her for raising the issue, and encouraged her to come forward with any additional concerns.  *Id.* ¶ 32.

Ms. Perkins was not satisfied with HR's response.  *Id.* ¶ 34.  She felt that HR had insufficiently protected her confidentiality during the investigation and later reported at least one subsequent "uncomfortable encounter" with Mr. Shaw.  *Id.* ¶¶ 34, 49–52.  On August 8, 2017, Ms. Perkins called the Metropolitan Police Department's (MPD) nonemergency line to report her concerns.  *Id.* ¶¶ 74–75.  According to her deposition, she told an officer "the whole situation," the "threat that Cris Shaw made [on June 15, 2017], and then HR breaching [her] confidentiality, and then that [she] was fearful of him or to myself, and felt like they were retaliating against me."  *Id.* ¶ 76.  MPD did not launch an investigation or file any charges; the officer told Ms.

Perkins that this was an issue that should be handled by the company according to its internal policies. *Id.* ¶¶ 77–78.

The day after calling MPD, Ms. Perkins emailed Scott Vossler, who had replaced Mr. Anglemyer as the President of WCS Construction, and Mr. Smith. Pl.'s Opp'n ¶ 152. The email stated: "As you all know but continue to avoid and deny I am in an extremely hostile work environment directly attributed to my reporting to HR the threat made by Cris Shaw and then the exposing of my confidentiality by HR to Cris Shaw." Pl.'s Opp'n Ex. EE ("Aug. 9 Email"), ECF No. 20-31. It concluded: "You all are operating unjust and illegal. I will be consulting representation and any support from the District as to how to handle this unfair and unjust treatment." *Id.* (Ms. Perkins contends here that "the District" here actually referred to "the [Seventh] District [of the Metropolitan Police Department]." Pl.'s Opp'n ¶ 152.) Neither recipient responded to the email; instead, it was forwarded "immediately" to Defendants' lawyers. *Id.* Some days later, on August 21, Ian Kessler, the Vice President of Human Resources, followed up about her email and invited her to a meeting with him and Mr. Vossler. Pl.'s Opp'n Ex. HH, ECF No. 20-34. Ms. Perkins was fired at this meeting. Pl.'s Opp'n ¶ 155.

### III.  LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and analyze all underlying facts and inferences in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). And because the nonmovant's evidence must allow a reasonable jury to find in its favor, "merely colorable" or "not significantly probative" evidence will not preclude summary judgment. *Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009) (quoting *Anderson*, 477 U.S. at 249–50).

## IV.  ANALYSIS

As framed by the Defendants, the central issue here is whether a jury could conclude that Ms. Perkins's termination falls under the public policy exception to the at-will employment doctrine. Generally, under District of Columbia law, an at-will employee like Ms. Perkins "may be discharged 'at any time and for any reason, or for no reason at all.'" *Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 27 (D.D.C. 2015) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991)). But in the District of Columbia, as in many jurisdictions, it can be illegal to terminate even at-will employees for reasons offensive to certain clearly-articulated public policies. *See Carl v. Children's Hosp.*, 702 A.2d 159, 160 (D.C. 1997) (en banc). For a claim to succeed, a plaintiff must both (1) point to "some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution," and (2) show that there is "a close fit between the policy and the conduct at issue in the allegedly wrongful termination." *Clay*, 128 F. Supp. 3d at 27 (D.D.C. 2015) (quoting *Davis v. Cmty. Alternatives of Wash., D.C., Inc.*, 74 A.3d 707, 709-10 (D.C. 2013)).

Earlier in this case, Defendants moved to dismiss Perkins's claim on the grounds that, even accepting the factual allegations in her complaint as true, her dismissal did not fall within the public policy exception. The Court disagreed, finding that Perkins had "sufficiently tied her claim to a public policy to survive the motion to dismiss." *Perkins v. WCS Constr., LLC* (*Perkins I*), No. 18-cv-751, 2018 WL 5792828 at *4 (D.D.C. Nov. 5, 2018). At this stage, with the facts now in clearer view and in light of new and refined arguments from Defendants, it is appropriate for the Court to take a fresh look at the applicability of the exception. *See Herron v. Fannie Mae*, No. 10-943, 2016 WL 1177918, at *17 (D.D.C. Mar. 8, 2016), *aff'd*, 861 F.3d 160 (D.C. Cir. 2017) ("Now that discovery is over, the Court may consider the entirety of the record and decide whether there [are] any statutes that support [plaintiff's] alleged public policy as required under D.C. law.").

Consistent with their arguments at the motion to dismiss stage, Defendants contend that they are entitled to summary judgment on either of two related grounds. First, they argue that Ms. Perkins cannot identify a clear statement of official policy that the termination supposedly offended. Defs.' Mem. in Supp. Mot. Summ. J. ("Defs.' MSJ") at 3, ECF No. 19-2. Second, they argue that, even if there is a sufficiently clear policy at issue, Ms. Perkins cannot establish the required connection or "fit" between the policy and the allegedly wrongful termination. *Id.* at 3–4. As at the motion to dismiss stage, Ms. Perkins has the better argument on both questions.

### A. Clear Public Policy

As this Court previously summarized, "courts in D.C. and in this circuit have painted a somewhat confusing picture of what constitutes a public policy sufficiently rooted in law to give rise to a claim for wrongful termination in violation of public policy." *Perkins I*, 2018 WL 5792828 at *4. Despite some uncertainty on the margins, however, "courts have generally found

a viable public policy to be involved in two types of situations." *Id.* First, "termination for engaging in an activity when the employee points to a law that reflects a policy prohibiting retaliation against an individual for engaging in the type of activity the employee was engaged in." *Id.* (citing *Freas v. Archer Servs., Inc.*, 716 A.2d 998, 1000–02 (D.C. 1998); *Carl*, 702 A.2d at 161). Second, "termination for reporting illegal conduct when the employee points to 'specific laws or regulations that clearly reflect a policy prohibiting the activity about which the employee complained, whether or not the employer actually violated the law or regulation.'" *Id.* (quoting *Leyden v. Am. Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 249 (D.D.C. 2015)).

In her complaint, Ms. Perkins identified three criminal statutes implicated by Mr. Shaw's actions: assault and threatened assault (D.C. Code § 22-404(a)(1)), affray (D.C. Code § 22-1301), and threatened kidnapping or threatened injury to another or their property (D.C. Code § 22-1810). *See* Compl. ¶ 44, ECF No. 1. She also relied on a statute that criminalizes obstructing or interfering with the report of a criminal offense to a law enforcement agency through force or intimidation (D.C. Code § 22-1931). *Id.* In denying the motion to dismiss, the Court suggested, without definitively deciding, that (1) Ms. Perkins's termination could be plausibly be characterized as a form of intimidation intended to prevent her from alerting the police and (2) her reporting of potential criminal activity (*i.e.*, Mr. Shaw's alleged threats) to HR and the police implicates a clear public policy embodied in at least some[2] of those general criminal statutes. *Perkins I*, 2018 WL 5792828 at *7. Specifically, the Court noted that D.C. code criminalizes "threatened assault or injury to another, which is essentially what she alleges Shaw did during the June 15, 2017 meeting." *Id.* at * 6; *see also* D.C. Code § 22-1810 (making it a crime to "threaten[] . . . to kidnap any person or to injure the person of another"); D.C. Code

---

[2] The Court was not "entirely convinced that affray is applicable to the facts of Perkins's complaint." *Perkins I*, 2018 WL 5792828, at *6 n.3.

7

§ 22-404(a)(1) (making it a crime to "unlawfully assault[], or threaten[] another in a menacing manner").

Rather than relitigating these issues directly, Defendants now press a slightly different argument. They suggest that the four statutes that Ms. Perkins invokes cannot serve as the basis for the public policy exception because none mandates a particular "standard of conduct for Defendants *as employers*." Defs.' MSJ at 23. On their view, it seems as though "generalized criminal statutes" can never serve as the basis for the public policy exception. *Id.* at 25 (arguing that "*at best*, the statutes Plaintiff relies upon amount to considerations for police and prosecutors in bringing general criminal charges, and notifications that there are criminal consequences to kidnapping an individual or inflicting serious injury to another"). For this proposition, Defendants rely on a close reading of *Herron v. Fannie Mae*, 861 F.3d 160 (D.C. Cir. 2017). But the Court does not read *Herron* as articulating such a rule. That case involved an employee who was fired after alleging improper management of a federal mortgage assistance program by her employer, Fannie Mae. *See id.* at 165–66. The Circuit found that source of public policy relied upon by the plaintiff in that case—certain broad provisions of the Emergency Economic Stabilization Act of 2008 ("EESA") that identified "public policy interests in preventing foreclosures and protecting taxpayers' interests"—"neither 'set out a standard of conduct' for Fannie Mae nor 'embody a specific public policy prohibiting [an employer] from engaging in the conduct [the employee] alleges." *Id.* at 171 (quoting *Leyden*, 83 F. Supp. 3d at 249) (alterations in original). In this Court's reading, however, the language from *Herron* and *Leyden* does not articulate a requirement that a particular public policy must somehow be employer-specific or address employers *qua* employers. Rather, the language is one of many glosses identifying when the exception can come into play. As *Herron* indicates elsewhere, the

8

more general "'common denominator' found in all of the cases applying the public exception" is "'the existence of specific laws or regulations that clearly reflect a policy prohibiting the activity about which the employee complained." *Id.* at 170 (quoting *Leyden*, 83 F. Supp. 3d at 249). *Herron* is more plausibly read as determining that "the general purpose of the [EESA] statute and the goals the Secretary [of the Treasury] must consider in exercising his statutory authority" were too amorphous to serve as sources of a public policy exception. *Id.* at 171; *see also id.* (noting that "courts are prohibited from creating new exceptions by 'broaden[ing] the policies expressed' in a statute or 'fill[ing] in a perceived gap in the statute'" (quoting *Carl*, 702 A.2d at 165 n.9, 162–63 (Terry, J., concurring) [3] (alterations in original))). Here, in contrast, Ms. Perkins is not pointing to some general statements of policy or broad statutory exhortations; rather, she has identified specific criminal statutes that are directly implicated by Mr. Shaw's alleged threats. In other words, the District of Columbia laws criminalizing threatened assault and threatened injury (at a minimum) "clearly reflect a policy prohibiting the activity about which the employee complained." *Herron*, 861 F.3d at 170 (quoting *Leyden*, 83 F. Supp. 3d at 249).

Defendants' fallback argument appears to be that Mr. Shaw's alleged conduct was not actually a violation of any of those cited criminal statutes. For example, as to § 22-404(a)(1), Defendants point out that Mr. Shaw did not physically assault anyone; he "used no 'force causing injury to another,' nor did he ever 'attempt to cause injury' to himself, Mr. Davies, or any other individual." Defs.' MSJ at 30. Additionally, as Defendants point out, "Plaintiff does not contend that the alleged victim [of the assault], Mr. Davies, was even present at the June 15, 2017 meeting," so he could not have directly perceived Mr. Shaw's words as a threat. *Id.*

---

[3] As this Circuit has recognized, "Judge Terry's concurrence in *Carl* 'constitutes the effective holding of the en banc court.'" *Herron v. Fannie Mae*, 861 F.3d 160, 170 n.1 (D.C. Cir. 2017) (quoting *Rosella v. Long Rap, Inc.*, 121 A.3d 775, 778 n.3 (D.C. 2015)).

Likewise, with respect to § 22-1810, "Plaintiff reported no workplace kidnapping." *Id.* at 28. However, the Court is not convinced. First, Defendants do not address how Mr. Shaw's alleged statement did not fully constitute a "threat[] . . . to injure the person of another." D.C. Code § 22-1810. Second, it is not clear that Ms. Perkins is required to have observed every element of the relevant crime in order to invoke the exception. To be sure, "conclusory assertions and beliefs regarding the illegality" of the conduct at issue are insufficient. *Bereston v. UHS of Delaware, Inc.*, 180 A.3d 95, 107 (D.C. 2018). But ultimately, Ms. Perkins's burden is merely to point to "the existence of specific laws or regulations that clearly reflect a policy prohibiting the activity about which the employee complained, *whether or not the employer actually violated the law or regulation*." *Leyden*, 83 F. Supp. 3d at 249 (emphasis added). In short, then, because the Court finds that both D.C. Code § 22-1810 and D. C. Code § 22-404(a)(1) represent "some identifiable policy that has been 'officially declared' in a statute," Plaintiff has met her burden on this score. *Clay*, 128 F. Supp. 3d at 27 (quoting *Leyden*, 83 F. Supp 3d at 249).

Ultimately, in the Court's view, the required analysis is relatively straightforward. The Court must view the facts in the light most favorable to the plaintiff. That means discounting the possibility that Ms. Perkins heard an ill-considered, fatalistic joke, and crediting Ms. Perkins's testimony that she observed and reported a credible threat of violence to Human Resources. Then, the narrow question is whether D.C. law has specifically[4] articulated a disapproval of

---

[4] *Clay* is perhaps the most helpful case for Defendants, because it declined to find a sufficiently specific public policy in "laws which criminalize fraud." *See* 128 F. Supp. at 29 (reasoning that "the general public policy against fraud is not nearly as specific as the policies at issue in other viable wrongful discharge claims"). But *Clay* is persuasive authority only, and it does not clearly explain why a law criminalizing fraud would be too general, while a law criminalizing bribery, like the one at issue in *Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803–04 (D.C. 1999), would not. *See id.* at 27–29. In any case, the criminal prohibitions at issue here—criminalizing threatened assault and injury—are arguably more specific than general

threatened violence. The answer, clearly, is yes.[5] As a result, under *Carl* and its progeny, an employer should not be permitted to fire an employee for reporting or complaining about a threat of violence. *Cf. Washington v. Guest Services, Inc.*, 718 A.2d 1071, 1080 (D.C. 1998) (case permitted to proceed where "Ms. Washington has alleged, under oath, that she was discharged for . . . protesting an alleged unsafe and unlawful practice."). [6]

### B. "Close Fit"

Defendants also argue that, "[e]ven if Plaintiff had engaged in protected activity (which she clearly did not), still there is no 'close fit between the policy . . . declared and the conduct at issue in the allegedly wrongful termination.'" Defs.' MSJ at 31 (quoting *Carl*, 702 A.2d at 164, (Terry, J., concurring)). As Defendants recognized, the question here is one of causation. *See Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 126 (D.D.C. 2012) ("Courts in this Circuit, interpreting the DCCA's decision in *Carl,* have required not only that a plaintiff clearly articulate

---

fraud statutes, which could apply to a broad range of conduct. Additionally, *Clay* also seemed to distinguish cases where, as here, "matters of human safety were at stake." *Id.* at 28.

[5] Because the assault and threat statutes provide the necessary clear statements of public policy needed to overcome the Defendants' motion for summary judgment, the Court declines to decide whether the affray statute or the statute prohibiting interference with the reporting of crimes represent additional sources of public policy.

[6] Some courts in this Circuit have articulated an additional requirement, determining that the public policy exception to the at-will doctrine "must arise from a statute or regulation that does not provide its own remedy.'" *Stevens v. Sodexo, Inc.,* 846 F. Supp. 2d 119, 126 (D.D.C. 2012) (citing *Carson v. Sim*, 778 F. Supp. 2d 85, 97 (D.D.C. 2011)). On this view, a criminal statute—which obviously has its own method of state-sponsored enforcement—might not qualify as a source of a public policy exception. But Defendants did not raise this argument, and it seems to be more properly implicated when there is a specific whistleblower or anti-retaliation statute that already provides a potential plaintiff with protection. *See Carter v. District of Columbia*, 980 A.2d 1217, 1226 (D.C. 2009) ("Thus, this is not a case where we have any need to create a new exception to the at-will employment doctrine in order to vindicate an important public policy. The Council squarely addressed the issue itself, articulating an express public policy in favor of government employee whistleblowing and creating a specific, statutory cause of action to enforce it."). Here, Ms. Perkins cannot and does not claim a benefit from any such protective scheme; her only source of protection is the public policy exception.

11

the applicable public policy, but also show a causal connection between protected activity in which that plaintiff engaged and his or her termination.") (citations omitted). Courts usually focus on whether the employer provided alternative, non-pretextual justifications for termination. *See, e.g.*, *Robinson v. Securitas Servs., Inc.*, 819 F. Supp. 2d 18, 20–21 (D.D.C. 2011) (finding no causal link based on evidence that employee was fired for deficient performance); *Brathwaite v. Vance Federal Sec. Servs., Inc.*, 613 F. Supp. 2d 38, 50 (D.D.C. 2009) (finding no causal link based on evidence that employee was fired for instigating a fight with another employee). However, questions of motive, intent, and pretext often hinge on credibility determinations by the finder of fact. *See Owens v. Nat'l Med. Care, Inc.*, 337 F. Supp. 2d 131, 143 (D.D.C. 2004) ("[E]ven if there is a plausible legal reason for the plaintiff's termination, the jury, after reviewing the evidence and making the necessary credibility determinations, [can] still conclude that the sole reason for his termination was because of the alleged protected activity").

Defendants maintain that "as of August 21, 2017, WCS Construction reasonably thought that Plaintiff was not going to be satisfied in any position or role, despite their efforts to appease her, and lawfully ended her at-will employment." Defs.' MSJ at 32. Characterizing the record somewhat, they argue that Ms. Perkins "walked out of meetings with executives, indicated she was having difficulty working with several different employees at her small 75-person employer, and continued to voice her dissatisfaction with her job, her employer, and everyday ordinary workplace occurrences." *Id.* Beyond these instances, Defendants do not point to any deficiencies in performance or clear instances of misconduct. If anything, insofar as they rest on generalized notions of "dissatisfaction" and "difficulty working" with others, Defendants' proffered reasons for firing are consistent with Ms. Perkins's theory that she was fired for causing trouble and drawing attention to her uncomfortable interactions with Mr. Shaw. At its

core, Defendants' argument seems to suggest that she was terminated not for reporting Mr. Shaw, but for not dropping the matter and for complaining about fallout she felt she experienced as a result. That is a nuance best left for a jury to decide.

For her part, Ms. Perkins points to a variety of direct and circumstantial evidence suggesting that she was fired for complaining about Mr. Shaw's alleged threat. During the meeting at which she was fired, she directly asked Mr. Vossler and Mr. Kessler: "And this is in direct relation to my reporting of Chris Shaw. And then the retaliation of him and every encounter we had after my reporting." Pl.'s Opp'n Ex. II at 10:8–11, ECF No. 20-35. One of the two answered: "How could I say no?" *Id.* at 10:12. A reasonable fact finder could interpret this as nearly a direct admission, and Defendants do not address or contextualize this exchange in their reply. Additionally, the temporal proximity between her report of the June 15 incident and her firing on August 22 is suggestive. *See Owens*, 337 F. Supp. 2d at 141 (denying defendant's motion for summary judgment on a wrongful discharge claim "since the facts demonstrate that the 'employer had knowledge of the employee's protected activity and that the adverse personnel action took place shortly after that activity'") (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). These considerations alone render the Court unable to grant summary judgment for the Defendants. A jury deserves to hear evidence from both sides and decide whose version of events is more credible.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 12, 2020                                             RUDOLPH CONTRERAS
                                                                                    United States District Judge